# UNITED STATES COURT OF APPEALS
## DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| UNITED STATES OF AMERICA ) | CASE NO. 23-3159 |
|     PLAINTIFF ) | |
| ) | |
| VS. ) | |
| ) | |
| ETHAN NORDEAN, ET AL ) | |
|     DEFENDANTS ) | APRIL 20, 2026 |

_____

### JOSEPH BIGGS' MEMORANDUM OF LAW IN OPPOSITION TO REPRESENTATIVE RASKINS' MOTION TO FILE AN AMICUS BRIEF

Appellant Joseph Biggs herewith files in opposition to the motion of Representative Jamie Raskin to file an Amicus brief in the instant case. In sum, he contends that Rep. Raskin's motion raises serious separation of powers claims, that Rep. Raskin comes to these proceedings with unclean hands, and that, as a self-styled "victim" in the case, Rep. Raskin's motion comes perilously close to asking to serve as a private prosecutor. In sum, while the Court has broad discretion to permit participation of amici, appearing as amici is a privilege, not a right. *United States v. Michigan*, 940 F.2d. 143 (6th Cir.1991). Courts are sensitive to the need to prevent undue interference in judicial proceedings on separation of powers grounds when a member of the House of Representatives seeks amici status. *People v. Gonzalez Malave,* 116 D.P.R. 578 (1985). *Malave* explicitly held that legislative bodies cannot

directly participate in criminal cases as amici to advocate for interests adverse to defendants on due process and separation of powers grounds. Id. Significantly, in this case, amici status should be denied as the petitioner will likely seek to introduce arguments not raised by the Department of Justice, thereby intruding on the DOJ's exclusive authority to litigate on behalf of the United States. *Health Republic Ins. Co. v. United States*, 129 Fed Cl. 115, 118 (2016).

## I.    Facts

The case arises from the Government's prosecution of Mr. Biggs and other members of the Proud Boys for their role in a protest that turned violent at the Capitol on January 6, 2021. Mr. Biggs was convicted after a five-plus month trial in the District of Columbia by a jury of 12 in May, 2023, and thereafter sentenced to a period of 17 years in prison.  Upon entry of judgment, he filed a timely notice of appeal. In January 2026, President Donald J. Trump commuted Mr. Biggs' sentence, but did not issue a pardon. Mr. Biggs has pending before this Court a motion to dismiss the appeal on grounds that he does not want to face the possibility of a retrial in the District of Columbia and potential imprisonment. He continues to seek a pardon from the president so that he can regain eligibility to receive a military disability pension he earned fighting overseas for the United States. He is a Purple Heart recipient.

The Department of Justice filed a motion to  dismiss the underlying appeal and for a remand to the District Court where, the DOJ indicates, it will seek a motion to dismiss the indictment with prejudice. Mr. Biggs consented to the motion to dismiss, which, under Rule 42 of the Federal Rules of Appellate Procedure, and under Local Rule 42, results in a dismissal of the action as a matter of right prior to the filing of any briefs. No briefs have been filed in the instant appeal. This is, of course, an issue separate and distinct from whether this Court will remand the matter to the District Court for further proceedings.

Days after the Government filed its motion to dismiss, Raskin, a member of the House of Representatives, filed his motion to appear Amicus Curie. Raskin was a member of the House Committee that investigated the January 6 riot.

On the first day of the 80-plus day trial of Mr. Biggs, his counsel, the undersigned, requested that the trial be continued on grounds that the House of Representatives was scheduled that very day to issue its report on the riot. That report was expected to lay blame for the riot, in part, to a "plan" coordinated by the Proud Boys and others to use force against the United States Government. Counsel argued that as a party, the United States, which was prosecuting Mr. Biggs, was poised to make the sort of prejudicial extrajudicial statement to the press likely to undermine Mr. Biggs' fair trial rights, conduct, which if engaged in by any other party or counsel could result in serious sanctions. As a separate and coordinate branch of Government, the

House spoke for the United States. (*United States v. Nordean*, et al, 1:21—cr-00175, December 19, 2022, **pp, 4-16, Appendix A**.)

The District Court, Kelly, J., denied the motion, concluding that the House is part of a separate branch of Government from the Executive, which was prosecuting the case. Judge Kelly seemed content to say that a different branch of the party prosecuting could act with impunity and otherwise not be held accountable for violation of Rules of Professional Conduct. Raskin, a lawyer, joined the chorus of those speaking out in condemnation of Mr. Biggs.

After 13 days of jury selection, and publication of a highly inflammatory report, which not only blamed the Proud Boys for an outsized role in planning the riot, but specially names Mr. Biggs, a jury was selected.

## II.     Argument

Courts may consider a number of factors in deciding whether to grant amici status. None weigh in favor of granting Raskin what he seeks.

The first factor is whether the court is "persuaded that participation by the amicus will be useful to it" *Health Republic*, 129 Fed Cl. at 116. In this case, Raskin makes no claim that he is even aware of the particular issues raised at trial. Did he, for example, take the time to read and study the 120,000-plus page transcript of the proceedings, or review the scores of briefs filed on a wide range of evidentiary issues? Or does he intend to submit the 650-plus page House Report on January 6th

4

as his contribution to the proceedings? See, for example, the edition produced by The New Yorker, *The January 6th Report*, The Report of the Select Committee to Investigate the January 6th Attack on the United States Capitol (2022). The report is conclusory, argumentative and replete with hearsay. Among the factual assertions presented in the report are things that simply are not true, and that the DOJ itself chose not to pursue as evidence at trial, to wit: the bogus claim that Mr. Biggs was armed with a gun on January 6. Id., p. 645. Chapter 6 of the report details the Committee's assertions about the Proud Boys and Mr. Biggs' role in what it sometimes refers to as an effort to "overthrow the U.S. Government," id., p. 499, a ridiculous claim unsupported by the evidence at trial. At most, Mr. Biggs and others used force to oppose the authority of the Government. That was the seditious conspiracy. Raskin's fever dream will contribute nothing to the proceeding.

A second factor the Courts may consider is whether the parties consent to amici participation. *Health Republic*, 129 Fed.Cl. at 116. Mr. Biggs tenders notice by way of this memorandum that he does not consent.

Third, a court may consider whether one of the parties is incapable of representing fully a party. *Health Republic*, at 116-17. That Raskin disagrees with the DOJ's decision to move to dismiss the case doesn't render the DOJ incapable, it means, simply, that Raskin, a member of the House, disagrees with how the DOJ uses its discretion to prosecute. Raskin's effort to cloud the proceedings at issue here

with his political judgments is a bizarre twist on the political question doctrine, which prevents Courts from deciding cases of controversies that are, in effect, political questions the deciding of which is vested in other branches of Government. Legislative oversight is not legislative supremacy.

Fourth, a court may consider whether amici participation "would directly affect the movant's rights*." Health Republic*, 129 Fed. Cl. at 117. *Flour Corp. & Affiliates v. United States*, 35 Fed. Cl. 284, 285 (1996). Raskin articulates no such right.

Finally, a court may consider whether amici participation would "unnecessarily delay the proceeding." *Health Republic*, 129 Fed. Cl. at 117. *Wolfchild v. United States*, 62 Fed. Cl. 521, 536 (2004). Perhaps this is Raskin's goal: to delay the litigation until allies gain control of the Executive branch and thereby pursue politically motivated prosecutions.

**A. The Separation of Powers Doctrine Does Not Support Legislative Involvement In What May Be A Dispute Between The Executive and Judicial Branches**

Raskin's memorandum is steeped in apparent concern for judicial oversight of executive action. He offers no credible claim that the legislature, or a legislator who was an architect of a detailed report on the very event that gave rise to a criminal trial, should have a role in proceedings of this sort. The very purpose of the

separation of powers doctrine was to create a necessary and healthy friction between separate and co-equal branches of government. Our constitutional scheme excludes the legislature from active involvement in criminal proceedings. Raskin's application is a breathtaking attempt to overreach with chilling implications. Should the House or a member of the House be given a seat at the table in this dispute, a dangerous precedent will be set, with lawmakers clamoring to be heard whenever publicity or polling data suggests it serves a representative's interests.

Similarly, Raskin's attempt to justify participation in the proceedings to somehow vindicate the adversarial process under Article III is not just unpersuasive; it is dangerous. The criminal adversarial process gives defendants certain rights as against the Government. Sixth Amendment rights are personal rights of a defendant; the prosecuting authority, an executive branch function, has no Sixth Amendment rights. While the Court has the responsibility to provide both parties a fair trial, there is absolutely nothing in the Constitution or centuries of decided cases, to give Congress, or congressmen, a place at the table in these adversarial proceedings. Raskin's reach far exceeds what the Constitution permits him to grasp. Mr. Biggs has never had the chance to confront Raskin and his committees, to test their assertions under cross examination and to require that due process be observed. No case supports Raskin's ambition. Indeed, at least one court has rejected legislative efforts to appear in criminal cases as potentially undermining due process and

violating the separation of powers doctrine. *People v. Gonzalez Malave*, 116 D.P.R. 578 (1985).

Congress's check and balance over executive and judicial functions has never extended into participation in actual criminal cases or controversies. Raskin would eviscerate the standing requirement in the name of political expedience and is a shameful attempt to tip a scale in Raskin's political direction. If Raskin has concerns about the Executive branch's behavior in moving to dismiss, the place to express that is in the legislative chambers, not in a courtroom.

Finally, there is no unique Congressional interest requiring vindication in these proceedings. The rule of law abhors special treatment for special people, even for seemingly sacrosanct institutions. Raskin's special pleading resembles a lobbyist's attempt to wave the flag on the eve of a roll call vote. It should be seen for what it is: a repulsive example of overreaching.

## B. Raskin Is An Unsuitable Amicus As He Comes To These Proceedings With Unclean Hands

Raskin enjoys legislative immunity from acts that would cause an ordinary lawyer to face serious disciplinary consequences. *Gentile v. State Bar of Nev.,* 501 US. 1030 (1991). Any member of the bar broadcasting his opinion about a defendant's guilt to the world on the eve of jury selection would face sanctions for prejudicial extrajudicial comments. Raskin's, and his committee's, report speaks for

itself. He invited the world to read his opinions, and then published them at taxpayer's expense as trial began in this case. There is no reason this Court should permit him another forum, this time, potentially, at the expense of a man whose fair trial rights Raskin's conduct already seriously compromised. As a lawyer, he ought to feel ashamed of himself for his using the shield of his legislative immunity to protect himself from censure for making blatantly prejudicial extrajudicial pretrial statements to the detriment of Mr. Biggs.

Raskin has already demonstrated an attenuated grasp of the fundamentals of criminal procedure. When [i]his committee summoned Alex Jones to testify and Mr. Jones pleaded the Fifth Amendment, Raskin announced to the press that the invocation was improper, even though the committee itself was attempting to paint Mr. Jones as a conspirator in a vast conspiracy against democracy itself.[1] *Rep. Jamie Raskin says Fifth Amendment is not a 'get-out-of-a-subpoena card after Alex Jones uses it 'almost 100 times'*, The Week, published January 26, 2022, (https://theweek.com/msnbc/1009423/rep-jamie-raskin-says-fifth-amendment-is-not-a-get-out-of-a-subpoena-card-after-alex, last accessed April 19, 2026)

Given the House Committee's report and its release as trial was set to begin, this Court can and should conclude that Raskin now comes to the Court with unclean

---

[1] The undersigned represented Mr. Jones and has personal knowledge of Raskin's unusual views.

hands. He is no friend of the court, in this case. Rather, he is a self-serving interloper. (**Appendix A**)

### C. Mr. Raskin's Self-Serving Claim Of Victimhood Casts Him In The Role Of Seeking To Be Heard As A Private Prosecutor; His Right To Be Heard Was At The Time Of Sentencing

Raskin's request to appear as amicus is an ill-disguised attempt to intervene in these proceedings. "Participation as amicus curiae, as opposed to becoming an intervenor, is appropriate when the party cares only about the legal principles of the case, and has no personal, legally protectable interest in the outcome of the litigation." *Russell v. Bd. of Plumbing Examiners*, 74 F. Supp. 2d 349, 351 (S.D.N.Y. 1999) (citing Moore's Fed. Prac. Digest 3d § 24.23), *aff'd*, 1 F. App'x 38 (2d Cir. 2001). The purpose of an amicus is "not to provide a highly partisan account of the facts, but rather to aid the court in resolving doubtful issues of law." *United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991). "Indeed, if the proffer comes from an individual with a partisan, rather than impartial view, the motion for leave to file an amicus brief is to be denied, in keeping with the principle that an amicus must be a friend of the court and not a friend of a party to the cause." *Leigh v. Engle*, 535 F. Supp. 418, 420 (N.D. Ill. 1982). "[A]n amicus curiae has no right to take over the management or control of the case." *Klein v. Liss*, 43 A.2d 757, 758 (D.C. 1945).

Raskin seeks to intervene in this case to further his own political agenda. He professes he is a victim of January 6, and he has made the event a focal point of his work in Congress. Now, he seeks to use this Court, and status as amicus, to take on the executive's role of ensuring the individuals involved are prosecuted to the fullest extent. He does so because he disagrees with the Executive's decision to undo the politically motivated prosecutions brought by the predecessor administration. As a professed victim steeped in the politics of January 6, Raskin is personally involved in these matters and has no business being permitted to intervene in these cases. *See Young v. United States*, 481 U.S. 787, 804 (1987) (requiring that a "private attorney appointed to prosecute" an action "be as disinterested as a public prosecutor"). If he wanted to be involved in this case, his time to do so was at trial, either as a witness or as author of a victim-impact statement. The undersigned is unaware of any case giving a victim the right to appear as an amicus. Raskin is no friend of this court. He should not be allowed to wage his political battle in this branch of government.

## III.   Conclusion

The unprecedented use of the nation's seditious conspiracy statute in the prosecution of this case is reason enough for the DOJ to move for a dismissal. At closing argument, the Government asserted a terrifying proposition of law: protesters could be prosecuted under a felony statute criminalizing violent behavior even in the absence of a plan, an implicit conspiracy, one formed in an instant, was

sufficient to convict. By this standard, every protestor is at risk should colleagues engage in riotous behavior at a public building. Eliminating this precedent is the sort judgment call the DOJ can and should make. Rather than serving as "in house counsel" for the Proud Boys, as Raskin so outrageously claims in his papers, the DOJ is better perceived as serving as counsel for the Constitution and the First Amendment. We the people need protection from hot headed politicians turning the law to partisan ends. The Constitution is better than Jamie Raskin.

Of course, the simple and elegant way to resolve this drama would be for President Trump to issue a pardon to Mr. Biggs. One cannot distinguish, for example, Mr. Biggs from his co-defendant, Enrique Tarrio, who was pardoned despite being convicted of identical charges and receiving a lengthier sentence. But a president's prerogative to exercise clemency is a matter of the president's, and the president's alone, discretion. One suspects that this is what really rankles Raskin. The representative's beef, it seems, is the manner in which the separation of powers doctrine operates in the federal government. This is not the place to hear more from Raskin. Let him save his ramblings for talk shows, floor debates, and the dark arts of Congressional compromise.

April 20, 2026                              RESPECTFULLY SUBMITTED,


                                           */s/     Norman A. Pattis, Esq.*
                                           Norman A. Pattis, Esq.
                                           Pattis & Paz, LLC
                                           171 Orange St., 2nd Floor
                                           New Haven, CT  06511
                                           Telephone:  203-393-3017
                                           Fax:           203-393-9745
                                           Email:  npattis@pattispazlaw.com

## CERTIFICATE OF COMPLIANCE

1.     I hereby certify that this motion complies with the type-volume limitation of Fed. R. App. P. (27)(d)(2)(A) of the Federal Rules of Appellate Procedure.  As measured by the undersigned's word processing system used to prepare this motion, this motion contains 3066 words.

2.     This document complies with the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in 14 point proportionally spaced roman style typeface (Times New Roman).

April 20, 2026                              */s/     Norman A. Pattis, Esq.*
                                            Norman A. Pattis
                                            Appellant's Counsel


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been electronically filed with the Clerk of Court using CM/ECF system which will send notification of such filing.

April 20, 2026

                                            */s/     Norman A. Pattis, Esq.*
                                            Norman A. Pattis
                                            Appellant's Counsel

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA     CR Nos. 1:21-cr-00175-TJK-1
                                  1:21-cr-00175-TJK-2
v.                                      1:21-cr-00175-TJK-3
                                    1:21-cr-00175-TJK-5

1-ETHAN NORDEAN                     1:21-cr-00175-TJK-6
2-JOSEPH R. BIGGS
3-ZACHARY REHL              Washington, D.C.
5-ENRIQUE TARRIO           Monday, December 19, 2022
6-DOMINIC J. PEZZOLA,       9:30 a.m.
                 Defendants.

- - - - - - - - - - - - - - - - - x

TRANSCRIPT OF JURY TRIAL - DAY 1
HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the United States:    Jason B.A. McCullough, Esq.
                        Erik M. Kenerson, Esq.
                        Conor Mulroe, Esq.
                        Nadia Moore, Esq.
                        U.S. ATTORNEY'S OFFICE
                        555 4th Street, NW
                        Washington, DC 20530
                        (202) 252-7233

For the Defendants:       Nicholas D. Smith, Esq.
                        DAVID B. SMITH, PLLC
                        7 East 20th Street
                        Suite 4r
                        New York, NY 10003
                        (917) 902-3869

                        John D. Hull, IV, Esq.
                        HULL MCGUIRE PC
                        1420 N Street, NW
                        Washington, DC 20005
                        (202) 429-6520

                        Norman A. Pattis, Esq.
                        PATTIS & SMITH, LLC
                        383 Orange Street
                        1st Floor
                        New Haven, CT 06511
                        (203) 393-3017

USCA Case #23-3159     Document #2169338     Filed: 04/20/2026     Page 15 of 30

```
APPEARANCES CONTINUED:

For the Defendants:        Carmen D. Hernandez, Esq.
                           7166 Mink Hollow Road
                           Highland, MD 20777
                           (240) 472-3391

                           Nayib Hassan, Esq.
                           LAW OFFICES OF NAYIB HASSAN, P.A.
                           6175 NW 153 Street
                           Suite 209
                           Miami Lakes, FL 33014
                           (305) 403-7323

                           Sabino Jauregui, Esq.
                           JAUREGUI LAW, P.A.
                           1014 West 49 Street
                           Hialeah, FL 33012
                           (305) 822-2901

                           Steven A. Metcalf, II, Esq.
                           METCALF & METCALF, P.C.
                           99 Park Avenue
                           6th Floor
                           New York, NY 10016
                           (646) 253-0514

Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111

Proceedings recorded by machine shorthand; transcript
produced by computer-aided transcription.
```

**P R O C E E D I N G S**

THE DEPUTY CLERK: Your Honor, this is criminal matter 21-175, United States of America versus Defendant 1, Ethan Nordean; Defendant 2, Joseph R. Biggs; Defendant 3, Question Rehl; Defendant 5, Enrique Tarrio; Defendant 6, Dominic J. Pezzola.

Present for the Government are Jason McCullough, Erik Kenerson, Conor Mulroe, and Nadia Moore; present for Defendant 1 is Nicholas Smith; present for Defendant 2 are John Hull and Norman Pattis; present for Defendant 3 is Carmen Hernandez; present for Defendant 5 are Nayib Hassan and Sabino Jauregui; present for Defendant 6 is Steven Metcalf. Also present are Defendant 1, Mr. Nordean; Defendant 2, Mr. Biggs; Defendant 3, Mr. Rehl; Defendant 5, Mr. Tarrio; and Defendant 6, Mr. Pezzola.

THE COURT: All right. Thank you, Ms. Harris. And I'm glad everyone found their way here easier than I did.

We are here for jury selection in this matter. I wanted to go over just with the parties very quickly how we will proceed here today. And we discussed this the last time we were here, but I just want to make sure we're all on the same page on that.

But before we do that, let me just ask, are there any preliminary matters either side wants to raise with me?

MR. PATTIS: Yes, sir, Judge. Norm Pattis on behalf of Mr. Biggs. I don't know whether other defendants will join in this, but I'm making an oral motion to continue jury selection until after the 1st of the year for the following reasons:

As is apparent to everyone who reads the papers, the House Committee on the very events that bring us to this trial is poised to act. It is poised to act in highly public, significant and potentially prejudicial ways. What is going to happen today at 1:00 o'clock, the committee will vote. It will refer certain individuals for criminal prosecution, up to and including potentially the former president of the United States, Donald Trump. I don't know who other referrals may be.

They will also, apparently, at 1:00 o'clock today, issue a 100-page exhaustive -- thorough executive summary, and they may or may not, depending on who you read, show a video of the events of January 6th.

Upon information and belief, at least from the sources I've been able to develop, that may be the very video that influenced the Court to continue the trial of this matter in the summer when the committee first convened and had its public event. My concern, obviously, is that by focusing on the Proud Boys and Mr. Biggs, as it did during jury selection, this could have a prejudicial effect.

I understand -- there's been extensive discovery in this case, and I'm overwhelmed by the generosity by the Government's counsel in making themselves available at all hours of the day or night to attend to our needs, but as we stand here now, I don't know what I don't know and, candidly, neither does the Government.

I read this morning in the Washington Post that when the full report is issued by the committee on Wednesday of this week, it will be an eight-chapter document which will contain one chapter on so-called extremists. I presume that's what will include information on the Proud Boys.

I further read that, after the publication of this report, documents will be made available to the Department of Justice that have hitherto been unavailable to us. And I don't know what's in those documents, whether there's going to be potential Brady material or not, or material that would require us to reconsider our witness lists.

You know, I've taken a look at all the cases that I can find on this issue, and this is sui generis in my view. I mean, this makes the potential prejudice in Skilling look like child's play. In Skilling, as the Court will recall, an Enron prosecution that took place four years after the event that blew up that city and disrupted so many lives, Mr. Skilling's counsel tried to argue that there was pretrial publicity such that it was too toxic an environment

in which to hold a trial.  The Supreme Court disagreed with, I think, the notable exception of Justice Sotomayor, whose dissent I commend to your leisure reading this afternoon -- who sought otherwise.

But I think more members of that court would side with us than sided with Skilling.  There simply is not a parallel in our reported cases to what's taking place in this courtroom today right now in the United States of America.  A former president is about ready to be referred by a co-equal branch of government for prosecution.  He's going to -- the report that is going to be highly publicized is going to say that these men were tools of his design.  We're back to the tool theory again.  So presumably, he's an unindicted -- the president -- the former president -- is an unindicted co-conspirator in this case.

Depending on what the committee says, we may or may not amend our witness list to bring in him as a witness.  Suppose he had a good-faith basis to believe, in spite of what the committee may report, that there had been tampering or theft of the election.  We saw in the Rhodes trial efforts to use his potential -- the president's potential invocation of the Insurrection Act as cover.  It may or may not -- it failed, obviously, with respect to the sedition charge.

This is a very different case.  These men are not

accused of bringing weapons or secreting them in the form of a quick reaction force across the Potomac.  It's an entirely -- these men are accused, in effect, of being President Trump's normies, or ab-normies [sic], to the degree the Government claims that the Proud Boys used the normies to storm the Capitol.  Apparently, the claim from the House Committee is that the president used the Proud Boys as his normies to storm the Capitol.

I mean, when does the silliness stop?  And as a matter of fair trial, aren't we entitled to at least evaluate what we don't know before we pick the jury?

So we're not asking that it be put off indefinitely.  It may be that there are no surprises in there, but we can't know what we don't know.  And so, as a matter of due process under the Fifth Amendment, our claim is our trial preparation is impaired, perhaps fatally; we don't know.

As a matter of picking the jury, you know, the Sixth Amendment gives us a right to an impartial jury.  And I would say the presumption of jury prejudice probably shifts fundamentally as of about 1:05 this afternoon once this report hits the public airwaves and the country erupts, depending on where you are on the political spectrum one way or the other as to its recommendations.

We don't want to be picking a jury in the middle

of this highly confusing and combustible environment, and we think asking for one week is not too much to ask. It would permit us this afternoon to do a snap assessment of the 100-page executive summary. It would permit us to know with certainty whether the very film that the House Committee threatens to show is the film that they showed earlier that led to this -- delaying this trial.

If the trial were continued through Wednesday, it might permit the Government, through the offices of the Department of Justice, to make a quick preliminary inquiry of the House Committee to determine whether there are, in fact, Brady materials in the legislative branch's possession that would affect our ability to go forward with this trial.

I'm mindful, Judge, of the separation of powers doctrine. How can I not be? And -- but what we have here is a textbook example calling for this Court to demonstrate to the public that the judiciary truly is independent and that when it comes to the vindication of an individual's rights when accused by the United States of America, there's one place and one place only that that defendant can come to, and that's to a judge, an Article III judge sitting for life by appointment to give meaning and practical import to the Bill of Rights. We're asking you for that.

What's happened here is the United States of America, through the Justice Department, has chosen to

prosecute our clients.  The United States of America has tied one branch of our government's hand behind its back and played hide the ball with respect to what it's doing.

Today, that other branch of government is going to release those hands and, by week's end, presumably, the United States of America's government will not be behaving like a schizophrenic two-headed behemoth, but like some principled entity that we can do battle with in this courtroom.

We're asking you to give practical meaning and effect to the Bill of Rights and to suspend these proceedings just for one week.  It would actually be two weeks, and, maybe, longer by the time we summon a new panel and get new questionnaires.  But this is not an event that we -- we engineered.  It's -- at argument last week or the week before -- I can't recall -- it was suggested that perhaps it was foreseeable to us that this would have happened, that we agreed on a December date back in the summer and that we should have known that this could happen.

I mean, you need a pretty good crystal ball to call congressional elections in this case, but I think what's clear is what's happened this week, or what's happening this week.  In the rush to get a report out before the committee -- before Congress changes partisan hands, the Democrats are going to rush this report out, and it's going

to flood the airwaves, and anybody with a pulse who cares about this republic is going to find it hard to ignore their report.

We've done a questionnaire that covers what we know. We don't know what we don't know. We're simply asking for one week, Judge, to assess the information as it comes out and determine whether, in fact, we need to do a new questionnaire, whether we need to do new witness lists, whether we need to do new exhibits, because we just don't know, and we can't know. And it's not through any fault of our own, and it's not through any fault of the Department of Justice. They've done the best we [sic] can, but nobody can get between Bennie Thompson and Liz Cheney, apparently, these days when it comes time to publish this report. And, in my view, Congress has behaved in a shameful way to the potential derogation of my client's fair trial rights, and we ask you for relief because we have nowhere else to turn.

THE COURT: All right. Thank you, Mr. Pattis.

Does any other defendant want to be heard very briefly? I think Mr. Pattis covered the waterfront on those arguments.

MS. HERNANDEZ: Good morning, Your Honor. Carmen Hernandez for Mr. Rehl.

I join in his -- in Mr. Pattis's statements to the Court. At a minimum, I think whatever questions are asked

today of this jury -- these jurors are going to have to be inquired -- these jurors are going to be asked -- have to be asked again what they saw, what they heard, whatever. So at least today, I think we're going to have to retrace our steps. But more fully, I join completely in his statements to the Court.

THE COURT: All right. Let me hear from the Government.

MR. HASSAN: Judge, Nayib Hassan on behalf of Mr. Tarrio.

THE COURT: Oh, I'm sorry.

MR. HASSAN: We also join, Judge. My apologies, Judge.

THE COURT: That's all right. I'll stipulate that all the defendants have joined in this motion.

MR. HASSAN: Thank you, Judge.

THE COURT: All right. Let me hear from the Government, please.

MR. MCCULLOUGH: Thank you, Your Honor. Jason McCullough for the United States.

Appreciate Mr. Pattis's kind words about our efforts to provide discovery in this case and ensure that the defendants have everything that the Government has and makes it available.

At this point, the parties are on equal footing.

Now, should documents become available to the Department of Justice -- as Your Honor knows, the Department of Justice is under your Court's order to advise the Court and the defendants of the receipt of any such materials within 24 hours. We will continue to do so. And we will continue to meet our discovery obligations as quickly as we can.

With respect to proceeding today, the jurors that are -- that you are bringing in have been admonished by Your Honor, through the jury questionnaire. And the jury questionnaire has covered matters related to the House Select Committee and any publicity around the House Select Committee's work, as well as the Proud Boys, as well as the Oath Keepers, as well as Antifa. These subjects are addressed in the jury questionnaire, and we will have the opportunity to inquire further of the jurors today.

In addition to that, Your Honor, right now, the one thing we can control is admonishing and continuing to monitor the jurors and ensuring that we seat an impartial jury panel. And with bringing the jurors in today, you will have another opportunity -- the parties will have another opportunity to admonish them and, frankly, that puts us in better control than simply waiting two weeks and allowing these other events to take place.

And so, Your Honor, the Government believes that we should go forward, certainly should continue to monitor

what comes out, and we will have an additional opportunity to address this jury panel when we return from the holidays, and we'll be able to conduct any confirmatory voir dire at that point in light of any information that has come out in the interim.

So the Government believes that proceeding at this point is the just and right thing to do, and it puts the Court and the parties in as much control over selecting an impartial jury panel as we can be in.  Thank you.

MR. PATTIS:  Two brief points, Judge.  I know you tire of incident argument, and I will be brief.  The parties are not on equal footing here.  Look at the caption here.  This is the United States of America versus five individuals.  One branch of government withheld this information.  So I just reject that notion.

As to the -- the presumption that a properly instructed jury is presumed to follow the law -- or it follows the law, I'm aware of that, but the whole point of having presumed prejudice is a recognition that some events are so extraordinary that that presumption is overcome.  I would suggest that when one branch of government refers a former President of the United States for a criminal prosecution in a very -- in the very conspiracy that defendants are appearing before trial on, that is sufficient in and of itself -- it's so unique -- to stop these

proceedings.

THE COURT:  All right.  I'll set out why I'm going to deny the motion.  It seems to me, Mr. Pattis, your motion is based on -- there's two separate kind of grounds you're arguing.  One is the pretrial publicity ground.  And the other is the, kind of, "we may get more materials" ground.

On the pretrial publicity, I largely agree with the Government here in the sense -- so a couple of different things.  First, we have known about the likelihood of some kind of report being issued and, maybe, some kind of hearing this week and/or next week for quite a while, certainly, since the results of the election in early November.  And so this really isn't anything new that's been sprung on us that -- that couldn't have been raised and talked about before today.

But more to the point, I do think that the Government is right when they say we've -- we have admonished the potential jurors through the questionnaire and, by proceeding today, I'm going to start when we bring them in as a group and swear them in -- the very first thing I'm going to say -- one of the first things -- is, don't look at the news.

So you know, we're going to have to monitor that, as the Government says, and all the rest.  But it actually puts us, I do think, in a better -- on terms of publicity,

in a better place than if we just put our heads down and came back in a couple of weeks. We do have a group of people who have been admonished already and will continue to be admonished over the course of the week and, you know, really, that's the best we can do.

So on publicity, it is an unusual situation, and I also don't think -- I think you said earlier that, like -- it's exactly the same conspiracy that your clients -- your client and the co-defendants are accused of. The president -- the former president is not on trial here today, and whatever -- we don't have any particular reason to believe that the focus of whatever happens in that committee today or tomorrow is going to be on your clients. We'll see. We'll see.

But I mean, part of my decision today is also, look, all these things haven't happened yet. So let's see what happens, and, maybe, we'll be in a different position -- you'll be in a different position. But I think, largely, the media probably today or tomorrow, whenever this goes on, will be focused on the former president as opposed to your defendants.

So we'll see. But on publicity front, I -- there's no -- to me, there's no harm and, in fact, the better course is to proceed today. We'll see where we are based on what happens.

Then on the information front, whether there's additional information that comes to light, again, I think -- I do agree that the parties are on equal footing. The Government -- the executive branch does not have whatever materials might be released right now.  Maybe there will be a basis, if some of the material is released, to continue the trial.  I tend to doubt it, but we don't know what we don't know.

So I don't think there's any harm, again, in proceeding today.  And you -- whatever happens this week, instead of speculating about what's going to happen, it will happen, and you'll be able to come back to me and make these arguments again.

So I'm going to deny the motion, I suppose, without prejudice.  We'll see where things go the rest of the week.

Is there anything else any party wants to raise in a preliminary way -- as a preliminary matter before we talk about the procedures going forward?

MR. METCALF:  Good morning, Your Honor.  Steven Metcalf on behalf of Dominic Pezzola.

I just have a brief issue I wanted to address just based on the sheer overwhelming amount of discovery that has to get ultimately reviewed and gone through with regards to this case.  I have actually been fortunate enough to have